IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| LAMPTON J. TURNER, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 17-cv-0656-MJR-SCW |
| WEXFORD HEALTH SOURCES, INC., LISA KREBS, VENERIO SANTOS, ARNEL A. GARCIA, STEVE MEEKS, and LISA PRATHER, | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**REAGAN, Chief Judge:**

### I. INTRODUCTION

Darryl Shannon (Plaintiff) filed a pro se complaint in this Court under 42 U.S.C. 1983, alleging that various correctional officials were deliberately indifferent to his serious medical needs, including hand and wrist pain and an abnormal BUN/CREAT ratio. The case is before the Court on Plaintiff's motion for preliminary injunction, seeking to compel medical care for his hand/wrist pain and low BUN/CREAT ratio (Doc. 2). Defendants moved to strike Plaintiff's motion; Plaintiff opposed that motion (Docs. 47 and 53). Defendants were directed to supplement their brief to further explain the BUN/CREAT ratio and Plaintiff's current condition. Defendants provided a supplemental affidavit (Doc. 79). Plaintiff filed a response to that affidavit (Doc. 83). Based on the following, the Court denies Plaintiff's motion for preliminary injunction.

## II.  SUMMARY OF KEY ALLEGATIONS AND FACTS

Plaintiff is incarcerated at Centralia Correctional Center.  He sues for violation of his federally-secured constitutional rights, seeking declarative relief, injunctive relief, and monetary damages.  As narrowed by the Court's threshold review order (Doc. 8, which allowed four counts to proceed against six named Defendants), Plaintiff alleges that Defendants have been deliberately indifferent to his hand and wrist pain and to the results of a blood test showing that Plaintiff had a low BUN/CREAT ratio (described further below, this is a test relating to kidney function).  Plaintiff alleges that he injured his hands and wrists when he fell on June 27, 2016 (Doc. 8, p. 2).  He was seen by Dr. Garcia on July 27, 2016 (*Id.*).  At that time, Plaintiff complained of numbness, tingling, aching, and swelling in his hands and wrists (*Id.*).  Dr. Garcia diagnosed Plaintiff with inflammation.  He prescribed Prednisone (a steroid) and Robaxin (a muscle relaxer) (*Id.*).  Plaintiff had a follow-up with Garcia on October 26, 2016, in which Plaintiff again complained of pain, and his prescriptions were renewed (*Id.*).  Plaintiff sought an additional follow-up on November 2, 2016 as his prescriptions, by then, had run out.  Told that he would have to pay a $5 co-pay for the visit, Plaintiff refused the appointment (Doc. 8, p. 2).

On November 10, 2016, Plaintiff began experiencing dizziness, tingling, skin crawling, and headaches, as well as pain in his hands and wrists (Doc. 8, p. 2).  He requested pain medication, but the nurse on duty refused, instead placing him on a list to see the doctor (*Id.*).  Plaintiff was seen by Dr. Santos on November 12, 2016 and was

told his symptoms might be a side effect of the prednisone, or possibly an allergy (*Id*.). Dr. Santos ordered a blood test but declined to order pain medication or an x-ray (*Id*.).

Plaintiff saw Dr. Santos again on November 17, 2016, to review Plaintiff's blood test (Doc. 8, p. 3). Plaintiff indicated he was still experiencing problems with his hands and asked for an x-ray (*Id*.). Santos denied the request for an x-ray. On November 25, 2016, Plaintiff indicated that he began hearing crunching sounds in his hands and experienced pain between his thumb and index finger, as well as cramping while writing and brushing his teeth (*Id*.). He also continued to experience back pain, neck pain, and dizziness (*Id*.).

On December 21, 2016, Plaintiff received his medical records and noted that his BUN/CREAT ratio was out of range (Doc. 8, p. 3; Doc. 2, p. 8). Plaintiff believed that the ratio was dangerously low, because his godmother (a nurse) told his mother so (*Id*. at p. 3-4). Plaintiff filed a grievance about his ratio and requested a blood pressure check. He was told in response to his grievance that the ratio, although "out of range," was not at "panic level" (*Id*. at p. 4; Doc. 1-1, p. 15).

On December 22, 2016, Plaintiff was referred to the doctor for continued pain in his arms and the crunching sound in his wrists (Doc. 8, p. 4). Plaintiff was seen by Dr. Santos and complained about symptoms in his right hand (*Id*.). Santos ordered an x-ray and Ibuprofen (*Id*.). Plaintiff experienced dizziness and passed out on January 15, 2017 (*Id*. at p. 5). Plaintiff also was experiencing frequent urination, pain in his kidneys, and shaking (*Id*.).

He saw Dr. Santos, who informed Plaintiff that his right ear was full of wax, which had caused the fainting (*Id.*). Plaintiff was provided with ear drops to remove the wax (*Id.* at p. 5). Plaintiff experienced dizziness again on January 18, 2017, and he asked to speak to the doctor (*Id.*). Plaintiff had an ear flush on January 21, 2017, which removed a ball of wax the size of a penny (*Id.*). He was seen again on February 11, 2017, but the nurse could not release any more wax in his right ear. The nurse told Plaintiff that he also had wax in his left ear that would need to be removed (*Id.*). However, Santos later denied Plaintiff had any wax in his left ear (*Id.*).

Plaintiff again saw Dr. Santos on February 6, 2017, reporting pain in his kidneys (Doc. 8, p. 5). Santos told him all his lab test results were normal (*Id.*). Santos also told Plaintiff that he suspected Plaintiff was faking his pain, because Santos had pushed on muscle and not his kidney when palpitating the area (*Id.*). Plaintiff asked about his BUN/CREAT ratio and asked for an MRI. Santos denied the MRI (*Id.* at p. 5-6). Plaintiff again saw Santos on February 14, 2017, asking for a CAT scan and an assessment of his BUN/CREAT ration (*Id.* at p. 6). Santos denied the CAT scan (*Id.*).

Plaintiff's motion for preliminary injunction seeks a referral to a hand specialist, a BUN/CREAT ratio specialist, and a neurologist to treat his hand injury and assess his BUN/CREAT ratio. Plaintiff alleges that his BUN/CREAT ratio has been out of range since 2012 (Doc. 2, p. 7-8) and that it can lead to kidney or liver failure, malnutrition, or the "eating" of his bones (Doc. 2, p. 2, 11, 19). Plaintiff explains that he stopped taking the ear drops he was given, because the label indicated the drops could cause dizziness,

and Plaintiff had been experiencing dizziness (*Id*. at p. 19).

Defendants Dr. Santos, Dr. Garcia, and Wexford Health Sources, Inc. moved to strike Plaintiff's motion for preliminary injunction. The Court sees no valid basis to strike the motion for preliminary injunction. The Court **DENIES** the motion to strike (Doc. 47) and construes the filing as a brief opposing the motion for preliminary injunction.

Both Garcia and Santos furnished sworn affidavits in support of their brief opposing a preliminary injunction. Dr. Garcia attests that he evaluated Plaintiff on July 27, 2016 for hand pain and provided Plaintiff with medication to treat his pain and numbness (Doc. 47-8, p. 2). Dr. Garcia further attests that he prescribed Plaintiff with Robaxin and a Medrol dose pack (a steroid that prevents inflammation) (*Id*.; Doc. 47-2, 47-3). Dr. Garcia acknowledged that Plaintiff had a blood test which revealed a BUN/CREAT ratio of 8.1, considered low on a 12-20 reference range (Doc. 47-8, p. 2). Although the score is low, Dr. Garcia does not believe that the results are indicative of a serious medical issue, since the BUN level and Creatinine level *individually* are each within normal range (*Id*.). Dr. Garcia dismisses Plaintiff's concerns regarding kidney failure, because that would result only when a ratio is too high, rather than too low (*Id*.). Dr. Garcia attests that Plaintiff's BUN/CREAT ratio is not at a panic level or a level of concern (*Id*.).

Similarly, Dr. Santos testified in his affidavit that Plaintiff received a blood test on November 16, 2016, which revealed a BUN/CREAT ratio of 8.1 L. However, Plaintiff's

Creatinine level was 1.35 and his BUN (Blood Urea Nitrogen) level was an 11, both within normal range (Doc. 47-7, p. 2; 47-6). Santos also testified that Plaintiff's BUN/CREAT ratio was not a serious medical concern or at a panic level (*Id.*). Santos further testified that he examined Plaintiff's hand on December 24, 2016 and scheduled an x-ray (*Id.*). The x-ray showed no fracture and revealed that the joint spaces and alignment were maintained (*Id.*; Doc. 47-4).

On January 11, 2018, Magistrate Judge Williams directed Defendants to supplement their response to provide an explanation as to why Plaintiff's BUN/CREAT ratio, although low, was not a serious medical issue and not at a "panic level." On January 31, 2018, Defendants supplemented their response with an affidavit from Defendant Garcia (Doc. 79). Dr. Garcia's affidavit indicates that the BUN/CREAT ratio measures an individual's kidney function and is made up of a ratio of an individual's BUN level and Creatinine level (Doc. 79, p. 2). A BUN measurement measures blood urea nitrogen, a waste product of protein breakdown which assists in evaluating kidney and liver function (*Id.*). A low BUN level indicates liver disease (*Id.* at p. 3). Creatinine is a waste product of muscle breakdown which also assists in evaluating kidney function (*Id.* at p. 2). A high Creatinine level indicates issues with the kidneys and would require a doctor to look into a possibility of kidney disease or other condition, such as a kidney obstruction or dehydration (*Id.* at p. 3).

Dr. Garcia testified that a doctor does not determine "panic levels" from a BUN/CREAT ratio (Doc. 79, p. 2). Instead, the ratio is qualified with the results of the

individual BUN and Creatinine levels (*Id*.). If the BUN level is out of range and low and/or the Creatinine level is out of range and high, then the individual would be considered at panic levels (*Id*.). The ratio is a potential first indicator of a problem but, Dr. Garcia testified, the ratio is then *qualified* by the individual levels to determine if there is a serious medical condition (*Id*.). Garcia testified that if the BUN and Creatinine levels, individually, are within normal range, then a low BUN/CREAT ratio is *not* considered a serious medical condition (*Id*.). A low BUN/CREAT ratio, according to Dr. Garcia, can be common for healthy individuals (*Id*. at p. 3).

As to Plaintiff's condition, Dr. Garcia testified that the low BUN/CREAT ratio could be due to a low protein diet, over hydration, or a low-but-normal BUN level paired with a high-but-normal Creatinine level (Doc. 79, p. 2). Plaintiff's BUN levels on November 16, 2016 were within normal range as they were an 11, within the normal range of 6-20 (*Id*. at p. 3; Doc. 47-6). Further, Plaintiff's Creatinine levels on November 16, 2016 were 1.35, on a normal reference range of .50- 1.50 (*Id*. at p. 3; Doc. 47-6). Dr. Garcia testified that because Plaintiff's Creatinine levels are within normal range, Plaintiff does not have a kidney issue (*Id*. at p. 3). As Plaintiff's BUN level, individually, is within normal range, Dr. Garcia testified that there is also no concern for liver disease or low protein diet (Doc. 79, p. 3). In addition, Dr. Garcia noted that Plaintiff's protein level was within normal range (his protein was at 6.8 with a normal reference range of 6-8) further indicating that Plaintiff did not have a protein issue (*Id*. at p. 3; Doc. 47-6). Plaintiff's liver enzymes, noted on the blood test as AST and ALT, were also within

normal range, further indicating that Plaintiff did not have any liver issues (*Id.*).

Plaintiff argues in response to Garcia's affidavit that his BUN and Creatinine levels have changed from 2012 to 2016, and Plaintiff believes that the changes are a sign that his health is worsening (Doc. 83). Plaintiff notes that his BUN levels were 11 in 2012 and were 10 in 2016, noting a one-point drop (Doc. 2, p. 7-8). Plaintiff's Creatinine levels in 2012 were 1.10 and in 2016 were 1.35, which Plaintiff notes means that the levels are going up (*Id.*). Plaintiff also notes that his total protein levels dropped from 7.8 in 2012 to 6.8 in 2016 (*Id.*). Finally, Plaintiff notes that his AST levels have dropped from 28 in 2012 to 25 in 2016, and his ALT levels dropped from 40 in 2012 to 25 in 2016 (*Id.*).

III. **PRELIMINARY INJUNCTION STANDARD**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, **520 U.S. 968, 972 (1997).** *Accord D.U. v. Rhoades*, **825 F.3d 331, 335 (7th Cir. 2016),** *citing Winter v. Natural Res. Def. Council, Inc.,* **555 U.S. 7, 24 (2008).**

To obtain a preliminary injunction, a plaintiff must show (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm without the injunction, (3) that the harm he would suffer is greater than the harm a preliminary injunction would inflict on defendants, and (4) that the injunction is in the public interest. *Judge v. Quinn*, **612 F.3d 537, 546 (7th Cir. 2010),** *citing Winter*, **555 U.S. at 20.** The "considerations are interdependent: the greater the likelihood of success on the

merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge*, **612 F.3d at 546.** *See also Korte v. Sebelius*, **735 F.3d 654, 665 (7th Cir. 2013).**[1]

In the context of prisoner litigation, there are additional restrictions on courts' remedial power. The scope of a court's authority to enter an injunction in the corrections context is circumscribed by the Prison Litigation Reform Act (PLRA). *Westefer v. Neal*, **682 F.3d 679, 683 (7th Cir. 2012),** *citing* **18 U.S.C. 3262(a).** Under the PLRA, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." **18 U.S.C. 3626(a)(2).** *See also Westefer*, **682 F.3d at 683 (the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prison officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citation omitted).**

The Seventh Circuit describes injunctions like the one sought here, which would require an affirmative act by the defendant, as *mandatory* preliminary injunctions.

---

[1] Some cases formulate the test in a slightly different way, saying the plaintiff first must prove three things – (1) without preliminary injunctive relief he will suffer irreparable harm before his claim is finally resolved, (2) he has no adequate remedy at law, and (3) he has some likelihood of success on the merits. If the plaintiff makes that showing, then the court weighs the harm the plaintiff will suffer *without* the injunction against the harm the defendants will suffer *with* the injunction, and also asks whether the preliminary injunction is in the public interest. *See Harlan v. Scholz*, **866 F.3d 754, 758 (7th Cir. 2017).** But all cases emphasize: "This type of relief must not lightly be granted." *Id.*

*Graham v. Medical Mutual of Ohio*, **130 F.3d 293, 295 (7th Cir. 1997).** Mandatory injunctions are "cautiously viewed and sparingly issued," because they require the court to command a defendant to take a particular action. *Id.*

IV. ANALYSIS

Plaintiff seeks a preliminary injunction to obtain treatment for his hand/wrist pain and his BUN/CREAT ratio. Specifically, Plaintiff seeks relief in the form of an order sending him to a hand specialist and/or neurologist and a BUN/CREAT ratio specialist. Plaintiff has not met his burden of demonstrating that he is likely to succeed on the merits of either claim, nor has he demonstrated that he will suffer irreparable harm in the absence of a preliminary injunction.

Plaintiff's underlying claims are for deliberate indifference to his hand pain and low BUN/CREAT ratio. Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005)**, *quoting Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (internal quotation marks omitted).** *Accord Rodriguez v. Plymouth Ambulance Serv.*, **577 F.3d 816, 828 (7th Cir. 2009)** (**"Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."**). However, a prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care or particular treatment. *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).** The first prong requires the prisoner to show that he has an objectively serious medical need. *Arnett*, **658 F.3d at 750.** *Accord Greeno*, **414 F.3d at 653.** A medical condition need not be life-threatening to be serious; it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** *Accord Farmer v. Brennan*, **511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires deliberate indifference to a *substantial* risk of *serious* harm).** Only if the objective prong is satisfied is it necessary to analyze the second, or subjective, prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652–53.**

Prevailing on the subjective prong requires a prisoner to show that a prison official had subjective knowledge of—and then disregarded—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.** The plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and then knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).**

### A. Hand/Wrist Injury

As to Plaintiff's hand/wrist injury, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits of this deliberate indifference claim.

At this time, there is no indication that Defendants were deliberately indifferent to Plaintiff's hand and wrist pain. Plaintiff has been seen by Defendants for this pain on numerous occasions. He was prescribed Robaxin and a Medrol dose pack for his hands by Dr. Garcia (Doc. 47-1, p. 1; 47-2, p. 1).[2] That prescription was renewed in October 2016 (Doc. 47-3, p. 1). When Plaintiff continued to complain of pain in his wrist, Dr. Santos ordered an x-ray which showed no fracture or dislocation (Doc. 47-4).

At this time, Plaintiff has not shown that Defendants are being deliberately indifferent to his pain. They provided him with pain medication after the injury and further looked for sources of his pain by completing an x-ray. Plaintiff has not demonstrated that he is entitled to a preliminary injunction on this basis.

B. **BUN/CREAT Ratio**

As to Plaintiff's request to be sent to a specialist for his low BUN/CREAT ratio, Plaintiff has not demonstrated that the condition constitutes a serious medical need. Plaintiff argues that his BUN/CREAT ratio is low and that it will cause eating the bones from lack of protein. He also argues that the low ratio will lead to kidney or liver failure. Plaintiff points to general medical documents which indicate that a low ratio could mean liver disease or malnutrition (Doc. 2, p. 11).

But the documents Plaintiff relies on state that the ratio "could" indicate health concerns, not that a low ratio always or necessarily signals a serious medical condition.

---

[2] Plaintiff argues that the records are not trustworthy because the ID number is scratched out, but there is nothing in the record to suggest that the documents have been falsified.

As Dr. Garcia points out in his affidavit, the ratio is a potential first indicator of a problem. Although it could indicate a serious medical condition, it could also be unremarkable in a healthy person (Doc. 79, p. 2, 4). Dr. Garcia testified that when an individual has a low BUN/CREAT ratio, a doctor must look at a patient's other, individual, levels to determine if there is a serious medical condition. Dr. Garcia testified that a doctor must look at the individual BUN, Creatinine, protein, AST, and ALT ranges to determine if an individual with a low ratio has a kidney or liver issue, or if an individual is suffering from malnutrition.

While Plaintiff's BUN/CREAT ratio is low, Plaintiff's other levels are within the normal range. The medical records indicate that Plaintiff's individual BUN and Creatinine levels are within normal range (Doc. 47-6). Dr. Garcia testified that a low BUN level might indicate liver disease, and a high Creatinine level might indicate kidney conditions, but Plaintiff's individual levels for both are within normal range, indicating that Plaintiff has no current issues with his liver or kidney (Doc. 79, p. 3).

Additionally, Dr. Garcia testified that when a BUN/CREAT ratio is low, it might be indicative of malnutrition. Thus, doctors turn to an individual's protein levels to determine if the low ratio is caused by dietary issues (*Id*. at p. 3). Plaintiff's protein levels also fell within the normal range, meaning that he does *not* have a protein issue. Finally, Dr. Garcia testified that liver function can be evaluated by looking at an individual's AST and ALT, but both of those levels were within normal range for Plaintiff (Doc. 47-6; Doc. 79, p. 3). Thus, Dr. Garcia concluded that Plaintiff did not have

a serious medical condition.

Based on the record currently before the Court, there is no evidence that Plaintiff has a serious medical condition to which the Defendants are being deliberately indifferent. As the records make clear, Plaintiff's individual levels are within normal range. While the levels have changed from an earlier blood test taken in 2012 (Doc. 2, p. 7), Plaintiff has not demonstrated that those changes constitute a serious medical need. The levels have changed slightly from Plaintiff's 2012 blood test, but all of the levels are still within normal range. The Court sees no evidence that Plaintiff is suffering from a serious medical need at this time.

Furthermore, Plaintiff has not demonstrated that there is some additional treatment that he requires which Defendants are refusing to provide, or that he would suffer harm without that treatment. There is no evidence in the record to indicate that Plaintiff requires treatment for a low BUN/CREAT ratio, when all of his other levels are normal. A the Court has previously concluded, there is no indication at this point that Plaintiff is suffering from kidney or liver issues. Nor is there evidence suggesting that he has malnutrition or dehydration -- as his levels are all within normal range.

Plaintiff has not indicated what other or additional treatment he requires. While Plaintiff wants to be sent to a specialist, there is no evidence anywhere in the record that further treatment is required for Plaintiff's low ratio. Dr. Garcia testified that when a ratio is low, a doctor is to look at the individual levels to determine if there is a medical issue causing the low ratio. Defendants have looked at Plaintiff's other levels, those

levels are all within normal range, indicating that he has no serious medical condition at this time. Thus, there is no indication that harm will befall Plaintiff if he is not sent to a specialist. As there is no evidence to suggest that Plaintiff has a serious medical need or that he will suffer harm if he is not seen by a specialist, the Court **DENIES** Plaintiff's request for injunctive relief.

V. CONCLUSION

A preliminary injunction is an extraordinary remedy, the issuance of which "is an exercise of a very far-reaching power, never to be indulged except in a case clearly demanding it." *Whitaker by Whitaker v. Kenosha Unified School District No. 1,* **858 F.3d 1034, 1044 (7th Cir. 2017),** *citing Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc.,* **549 F.3d 1079, 1085 (7th Cir. 2008).** Plaintiff has not satisfied his burden of demonstrating that a preliminary injunction is warranted here. For the reasons explained above, the Court **DENIES** Defendant's motion to strike (Doc. 47) and **DENIES** Plaintiff's motion for a preliminary injunction (Doc. 2).

IT IS SO ORDERED.

DATED February 22, 2018.

s/ Michael J. Reagan  
Michael J. Reagan  
United States District Judge