## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LAMPTON J. TURNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:17 -CV-656 -MAB** |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Lampton J. Turner filed this suit under 42 U.S.C. § 1983 against various officials who worked at the Centralia Correctional Facility and against certain health care professionals who worked for Wexford Health Sources, Inc. (who contracts to provide medical services to inmates of the Illinois Department of Corrections). Now pending before the Court are two motions for summary judgment filed by Defendants Dr. Arnel Garcia, Dr. Venerio Santos, and Wexford Health Sources, Inc. ("Wexford"), collectively referred to as "Wexford Defendants," (Docs. 184, 185) and Defendants Lisa Krebs and Steve Meeks (Docs 187). For the reasons set forth below, the motions for summary judgment are GRANTED.

## PROCEDURAL BACKGROUND

Plaintiff filed his complaint on June 26, 2017, pursuant to 42 U.S.C. § 1983, alleging that certain prison employees acted with deliberate indifference to his serious medical needs (Doc. 1). After a threshold review by this Court, pursuant to 28 U.S.C. § 1915A,

Plaintiff was permitted to proceed on four counts (Doc. 8). The following claims survived

the threshold review:

> **Count 1**—Defendant Garcia was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment when he refused to adequately treat Plaintiff's hand and wrist pain that resulted from a June 27, 2016 fall and refused to respond to kites about Plaintiff's BUN/CREAT ratio;

> **Count 2**—Defendant Santos was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment when he failed to address or order further testing on Plaintiff's dizziness, tingling, skin crawling, headaches, continuing pain in his hands and wrist, low BUN/CREAT ratio, kidney paid, and ear wax problem;

> **Count 3**—Defendants Meeks, Prather, and Krebs[1] were deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment when they refused to intervene after being informed of Plaintiff's difficulties securing treatment for his various medical ailments;

> **Count 4**—Wexford Health Sources had 7 unconstitutional policies, protocols, or customs that violated Plaintiff's constitutional rights, including 1) prescribing over-the-counter ("OTC") painkillers only; 2) requiring certain conditions to reach a "panic" level prior to providing preventative care; 3) refusing to see inmates if they don't pay a co-pay; 4) only providing ear drops for dizziness and wax build up; 5) refusing to staff a 24-hour doctor or evening doctor; 6) refusing to refer patients to an outside specialist; 7) refusing to provide special diets when blood results are out of range (Doc. 8, p. 7).

On May 16, 2019, the Wexford Defendants filed their motion and memorandum

for summary judgment (Docs. 184, 185). Defendants Krebs and Meeks filed their motion

for summary judgment on May 20, 2019 (Doc. 187). Plaintiff filed his response to

Defendants' motions for summary judgment jointly in one document on September 24,

---

[1] Defendant Prather was terminated in an Order (Doc. 125) adopting a Report and Recommendation (Doc. 120) after the Wexford Defendants filed a motion for summary judgment on the issue of exhaustion (*see* Docs. 74, 75).

2019 (Doc. 197). Wexford Defendants then filed a reply brief pursuant to Local Rule 7.1(c).

## FACTUAL BACKGROUND

### A. The Parties

At all times relevant to this case, Plaintiff was incarcerated within the Illinois Department of Corrections ("IDOC") at Centralia Correctional Center ("Centralia") (Doc. 187, p. 2). Defendant Krebs was employed as the Health Care Administrator at Centralia (Doc. 38). Defendant Meeks was employed as the Medical Administrator IV-Chief of Health Services (Doc. 38). Defendants Santos and Garcia were employed by Wexford as medical doctors at Centralia during the time of the events described by Plaintiff (Docs. 23 and 25).

### B. Timeline of Plaintiff's Medical Care

On June 26, 2016, Plaintiff fell onto the base of both of his hands while at Centralia (Doc. 187-1, pp. 12-14). Plaintiff "doctored" himself for some time by placing ice on his hands, running his hands under hot water, and taking ibuprofen that he purchased from the commissary (Doc. 187-1, pp. 13-14). He did not seek medical attention at first at the prison's healthcare unit because he did not want to pay the copay of $5.00 (Doc. 197, p. 2). Over the course of the month, though, Plaintiff's pain got worse and he felt like he was being stabbed by needles in his hand, so he asked two corrections lieutenants to send him to the healthcare unit (Doc. 187-1, pp. 13-15). Plaintiff waited approximately one month, in total, before seeking medical attention at Centralia (Doc. 187-1, p. 15).

Plaintiff saw a nurse on July 24, 2016 and was given ibuprofen (Doc. 187-1, pp. 15-16). Plaintiff states he told the nurse he was having pain in his hands and wrists, including

numbness, tingling, aching, and swelling (Doc. 187-1, pp.15-16; Doc. 185-1, p. 81). The nurse observed swelling in his hands and recommended that Plaintiff see a doctor. *Id.*

Plaintiff saw Defendant Garcia on July 27, 2016, three days after Plaintiff saw the nurse (Doc. 187-1, p. 18; Doc.185-1, pp. 71-72; 82). Defendant Garcia examined Plaintiff's hands and diagnosed him with arthralgia and stiffness (Doc. 185-1,p. 82). Defendant Garcia reported that Plaintiff had inflammation in his hands and Plaintiff testified he was prescribed Prednisone (a corticosteroid) and Robaxin (a muscle relaxant) (Doc. 187-1, pp. 18-19).[2] After taking the medications, prescribed for six days, Plaintiff suffered a month of insomnia (Doc. 187-1, pp. 18-21).

Plaintiff still continued to experience pain in his hands and went to "nurse sick call" on October 23, 2016, where he complained of pain in his hands and wrists, swelling, and numbness, particularly at night (Doc. 187-1, p. 21; Doc. 185-1, p. 85). Plaintiff did not seek medical treatment between his July 27, 2016 medical visit and the October 23, 2016 nurse visit (Doc. 187-1, p. 21). At this October visit, the nurse referred Plaintiff again to a doctor (Doc. 187-1, p. 21; Doc. 185-1, p. 85).

Plaintiff saw Defendant Garcia for treatment on October 26, 2016 (Doc. 187-1, p. 21; Doc. 185-1, pp. 73, 90). He was evaluated for issues with his hands and wrists (numbing, tingling, aching, and swelling) as well as constipation (Doc. 187-1, pp. 21-23; Doc. 185-1, pp. 73, 90)**.** Plaintiff testified that Defendant Garcia did not examine his hands

---

[2] Although Plaintiff testified that he was prescribed Prednisone, Plaintiff's medical records indicate that he was prescribed Medrol. *See* Doc. 185-1, pp. 71-72. Both Prednisone and Medrol are steroids (Doc. 120, p. 2).

before prescribing him medication for his symptoms (Doc. 187-1, p. 23). According to his medical notes, Defendant Garcia did not observe any swelling in Plaintiff's hands or wrist during the examination, but still prescribed Plaintiff a muscle relaxer and steroid (Doc. 185-1, pp. 73, 90). Plaintiff explained that these medications did not alleviate his pain before, so Defendant Garcia told Plaintiff to take the same medication for a longer period (Doc. 187-1, pp. 21-23). After October 26, 2016, Plaintiff did not see Defendant Garcia for treatment again (Doc. 187-1, p. 30).

After this visit, Plaintiff testified he was told by the nurse that they were out of the steroid medication and he would have to come back to fill that prescription (Doc. 187-1, pp. 22-23; 34-39). A few days later, he returned to get the medication, but noticed there was not a refill provision, which was necessary for Plaintiff to continue it (Doc. 187-1, pp. 22-23; 34-39). Plaintiff went back to the healthcare unit on November 2, 2016 in order to refill his prescription (Doc. 187-1, p. 34; 187-2). He was told he would have to pay another $5.00 copay to continue getting refills (Doc. 187-1, pp. 22-23, 34-39). Plaintiff refused to pay the copay (Doc. 185-1, p. 91).

Plaintiff testified that the side effects from the medication prescribed by Defendant Garcia caused further pain to his hands and wrists, causing numbing, tingling, aching, and swelling to his hands. Plaintiff described feeling nerve pain in both arms and claimed the medication also caused dizziness, skin crawling, body tingling, and the feeling that veins were popping out of his head with massive headaches (Doc. 187-1, pp. 25-26).

Plaintiff visited the healthcare unit again for a sick call on November 10, 2016 (Doc. 187-1, p. 36; Doc. 187-2). Plaintiff was sent to the healthcare unit after notifying a wing

officer he was dizzy, had crawling skin, body tingling, pain in his hands and face, and the feeling of his veins popping out of his head (Doc. 187-1, p. 39-40). Plaintiff was referred to a doctor for these symptoms, but was not given medication for the pain at this time despite requesting pain medication for his symptoms (Doc. 187-1, pp. 39-40; Doc. 185-1, p. 92). The nurse reported that Plaintiff's heart rate was elevated, but there were no other physical signs of his ailments observed by the two nurses who examined him (Doc. 185-1, p. 92). In addition, the nurse noted that Plaintiff may have anxiety. *Id.*

Plaintiff saw Defendant Santos for the first time on November 12, 2016 (Doc. 187-1, p. 42). During the examination, Plaintiff complained of numbing, tingling, aching, and swelling in his hands, as well as body tingles as if his skin was crawling (Doc. 187-1, p. 42). Defendant Santos performed an examination and prescribed medication (Doc. 187-1, pp. 42-43; Doc. 185-1, p. 95). Defendant Santos also agreed to perform blood work at Plaintiff's request (Doc. 187-1, p. 44). Defendant Santos noted that Plaintiff possibly had anxiety and non-specific complaints (Doc 185-1, p. 95).

Plaintiff saw Defendant Santos again on November 17, 2016 to go over his symptoms and review the blood work results (Doc. 187-1, p. 42-44; Doc. 185-1, pp. 78-79, 97). Defendant Santos indicated that the blood results were normal (Doc. 187-1, p. 45; Doc. 185-1, pp. 78-79, 97). Plaintiff explained he was still having the same issues of numbness, tingling, aching, and swelling (Doc. 187-1, p. 45). Plaintiff requested an X-ray; however, based on the lab results and his examination, Defendant Santos did not think X-rays were necessary (Doc. 185-2, p. 97). Defendant Santos advised Plaintiff that further tests were not necessary, in general, and to return to the healthcare unit if his symptoms

reoccurred or worsened (Doc. 187-1, pp. 45-46). Plaintiff testified that Defendant Santos told him to "write his grievance and get out," as well as lied and told him his name was "Garcia," instead of "Santos" (Doc. 187-1, p. 46).

Plaintiff's mother called Defendant Krebs on November 30, 2016 to speak with her about the pain in his hands, but Plaintiff was not on that phone call (Doc. 187-1, p. 113). Plaintiff believes Defendant Krebs did not do anything to address Plaintiff's medical issues after the call because Plaintiff never heard from Defendant Krebs (Doc. 187-1, p. 115).

Plaintiff signed a release and picked up his medical records on December 21, 2016 (Doc. 187-1, p. 108). In his medical records, Plaintiff learned that his BUN/Creatinine level ("BUN/CREAT") was out of range, indicating a lack of protein (Doc. 187-1, pp. 80-82). Specifically, his BUN/CREAT ratio was 8.1, lower than the normal range of 12-20.[3]

Plaintiff returned to the healthcare unit for complaints of pain and discomfort on December 22, 2016, when he was referred to see a doctor (Doc. 187-2, p. 96; Doc. 185-1, p. 98). The nurse noted in his chart that he had a small bump on his wrist, but there was no swelling in his hands (Doc. 185-1, p. 98). Plaintiff met with Defendant Santos on December 23, 2016 (Doc. 187-1, p. 50; 185-1, p. 99). Plaintiff complained of pain in his right hand for the last six months, as well as a cyst on his wrist and a "crunching sound" in his right hand (Doc. 187-1, p. 50). Plaintiff testified that when he attempted to show Defendant Santos his hands, the doctor smacked his hands and said, "Don't touch me."

---

[3] This test checks levels of blood urea nitrogen and serum creatinine, and can be useful in assessing kidney function and dehydration (Doc. 125, p. 1).

(Doc. 187-1, pp. 50-52). Defendant Santos noted there were no signs of swelling or tenderness, nor did he have limitation of movement (Doc. 185-1, p. 99). Plaintiff testified that Defendant Santos grabbed his hand with enough force during the examination that Plaintiff pulled his hand away and exclaimed, "Ouch!" (Doc. 187-1, pp. 50-52). Defendant Santos ordered an X-ray at Plaintiff's request and prescribed ibuprofen (Doc. 187-1, pp. 50-52; 185-1, p. 99).   Plaintiff testified he told Defendant Santos that ibuprofen was not working for the pain and Defendant Santos replied, "I don't care. Leave" (Doc. 187-1, pp. 50-52).

Plaintiff testified that a nurse spoke to Defendant Krebs at his request on December 27, 2016 about his treatment and continued pain (Doc. 187-1, p. 116). Then, on December 28, 2016, a Dr. Austin interpreted Plaintiff's X-ray, with the findings as follows: "The joint spaces and alignment are maintained. There is no acute fracture or dislocation. The visualized soft tissue is unremarkable" (Doc. 185-1, p. 75).

Plaintiff's medical records reflect multiple nurse notes in December 2016 and January 2017 as he was repeatedly seen approximately ten times by nurses and one time by a doctor (Doc. 185-1, p. 100-104).

Plaintiff sought medical treatment again on January 15, 2017 after he passed out in his cell (Doc. 187-1, pp. 58-60; Doc. 185-1, p. 104). He was monitored by nurses in a 23-hour hold due to this loss of consciousness, dizziness, and back pain (Doc. 185-1, pp. 104-109). He was also prescribed Tylenol 650 mg for his pain (Doc. 185-1, p. 74).

Plaintiff saw Defendant Santos on January 16, 2017 for his complaints of dizziness and right lumbar pain in his back around his kidney (Doc. 187-1, p. 60; Doc. 185-1, p. 111).

Defendant Santos performed an examination and found wax build up in Plaintiff's right ear, which he believed caused him to pass out (Doc. 187-1, p. 61). Defendant Santos prescribed Debrox for wax build up in his ears (Doc. 187-1, p. 61). Plaintiff also had a urine test during this visit to assess the cause of his back pain (Doc. 187-1, pp. 61-62; Doc. 185-1, p. 80, 112). Plaintiff had an ear flush on January 21, 2017 for his wax build up (Doc. 187-1, p. 65; Doc. 185-1, p. 113).

Plaintiff returned to the health care unit for complaints of dizziness, hand numbness, and right lower back pain (including in the kidney area) on February 4, 2017 (Doc. 185-2, p. 113-114). Plaintiff testified he was given the results of his urine lab at this appointment (Doc. 187-1, pp. 65-66). The results indicated there was no mucus or sediment in his urine and that Plaintiff was dehydrated (Doc. 187-1, pp.64-65). During this visit, Plaintiff indicated to the nurse that he was still experiencing dizziness, pain in his hands and wrists, and pain in his kidney area (Doc. 187-1, p. 66). The nurse referred Plaintiff to the doctor for his symptoms (Doc. 185-1, p. 114).

Plaintiff saw Defendant Santos on February 6, 2017 for these symptoms (Doc. 187-1, p. 66; Doc. 185-1, p. 115). Defendant Santos performed an examination and found that Plaintiff still had wax in his ears, but that his heart and lungs sounded normal. (Doc. 187-1, pp. 66-67). Defendant Santos examined Plaintiff's kidneys and found that they were normal and that he had no neurological deficit. His hands were not swollen, and he did not suffer from limitation of movement in his joints (Doc. 185-1, p. 115). Plaintiff requested an MRI for his hand pain, but Defendant Santos found that it was not necessary (Doc. 185-1, p. 115). Plaintiff was prescribed Debrox again to remove the wax from his

ear, but did not take it because he read that dizziness is a side effect of the medicine (Doc. 187-1, p. 73).

Plaintiff was seen multiple times by nurses in the healthcare unit at Centralia during the month of February 2017 on February 8, 9, 10, 11, 12, and 14, at which point he was referred to a doctor (Doc. 185-1, pp. 116-118).

Plaintiff was last seen by Defendant Santos on February 14, 2017 (Doc. 187-1, p. 84; Doc. 185-1, p. 116). Defendant Santos examined Plaintiff's ear since he was unable to use Debrox and found no more wax build-up (Doc. 185-2, p. 118). Plaintiff explained he was still in pain and asked for a CAT scan, which Defendant Santos denied (Doc. 187-1, pp. 84-85). Overall, Defendant Santos reported that his examination was completely normal (Doc. 185-1, p. 118). Defendant Santos diagnosed Plaintiff with possible anxiety and referred him to the mental health department (Doc. 185-1, p. 118). Plaintiff missed two appointments for a mental health evaluation on May 15, 2017 and May 19, 2017 (Doc. 185-1, pp. 120-121). He had a full mental health evaluation on May 31, 2017, when he was diagnosed with "Substance Use Disorder—Alcohol Mild" (Doc. 185-1, pp. 122-136).

### C.  Plaintiff's Informal and Formal Grievances

Plaintiff testified he filed a series of informal and formal grievances throughout his quest to seek what he viewed as appropriate medical treatment. Plaintiff testified he filed grievances on November 2, 2016; November 17, 2016; November 22, 2016; November 28, 2016; November 29, 2016; December 23, 2016; January 9, 2016; and January 18, 2016 (Doc. 187-1, pp. 120-121). Plaintiff testified that Defendant Krebs called his mother on January 11, 2017 (Doc. 187-1, p. 125).   In addition, Plaintiff testified that he

sent internal letters about his medical care on December 18, 2016; January 13, 2017; January 18, 2017; January 23, 2017; February 6, 2017; and February 14, 2017 (Doc. 187-1, p. 122).

Plaintiff testified he wrote to Defendant Krebs on November 17, 2016 to request a meeting with her about his medical treatment, but did not hear back (Doc. 187-1, pp. 111-112). A copy of this letter is not in the record. When he didn't hear back, Plaintiff had his mother call Defendant Krebs (Doc. 187-1, p. 112). During his December 27, 2016 blood pressure check up with the nurse, Plaintiff was informed that his BUN/CREAT ratio was out of range and asked the nurse to call Defendant Krebs, who did not speak to him and said that he will get the answers he seeks in his grievances (Doc. 187-1, pp. 116-117).

Defendant Krebs responded to Plaintiff's December 23, 2016 grievance upholding the care provided to Plaintiff by Defendants Santos and Garcia (Doc. 187-3, p. 2). Plaintiff filed another grievance on or around January 18, 2017. In it, he complained that his BUN/CREAT ratio was out of range. Plaintiff testified Defendant Garcia personally responded that while it was reported out of range, it was not at a "panic" level, thus did not require any medical action (Doc. 187-1, pp. 29-30).[4] The official grievance report outlines that Defendant Meeks reviewed this grievance and agreed with the care provided by Defendants Santos and Garcia (Doc. 187-3, pp. 1, 4). Defendant Meeks also

---

[4] Plaintiff believes that Defendant Garcia received information about his bloodwork, including information regarding Plaintiff's concerns of a low BUN/CREAT ratio because he testified that Dr. Garcia personally answered his January 18, 2017 grievance, stating that his BUN/CREAT ratio was out of range (Doc. 187-1, p. 30-31); however, the record shows that Defendant Meeks responded to this grievance.

referred Plaintiff for a mental health examination after this grievance (Doc. 187-1, p. 101).

Plaintiff testified he wrote to Defendant Krebs to ask her for a high protein diet since, he understood from family friends in the medical field, this was a known treatment for a low BUN/CREAT ratio, but Plaintiff did not hear back from Defendant Krebs (Doc. 187-1, pp. 80-82). A copy of this letter is not in the record.

Defendant Krebs followed up regarding Plaintiff's January 18, 2017 grievance, noting that treatment was provided for the incident (Doc. 187-3, pp. 8-9). Plaintiff admits Defendant Krebs forwarded a grievance regarding Defendant Santos to Internal Affairs (Doc. 187-1, pp. 123-124). As a result, Plaintiff was interviewed by Internal Affairs (Doc. 187-1, p. 124).

### D. Wexford's Policies

Information regarding Wexford's policies and practices in the record is based solely on Plaintiff's testimony. Plaintiff testified that one of the nurses explained to him that when prisoners have ear pain like the pain he experienced from wax build up, Centralia's healthcare unit only provides Debrox eardrops (Doc. 187-1, p. 88). Plaintiff also testified that he believes Wexford has a policy of not providing medical diets to prisoners (Doc. 187-1, p. 89). However, Plaintiff testified that he has not seen documentation of Wexford's policies when it comes to medical care, particularly Wexford's policies of not providing protein diets when necessary (Doc. 187-1, pp. 94-95). Plaintiff admits he has not been informed whether Wexford maintains a policy or procedure for only providing Debrox for treatment of earwax (Doc. 187-1, pp. 96-97). Plaintiff testified that he believes Wexford has a policy for only providing Tylenol and

ibuprofen for pain, but has not been informed this is an actual Wexford policy or procedure (Doc. 187-1, p. 97). Similarly, Plaintiff admits that he has not seen any documentation and has not been informed that Wexford maintains a policy for only informing patients of their blood results when they are at a panic level (Doc. 187-1, p. 98).

LEGAL STANDARD

Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, but instead to determine whether there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). In deciding a motion for summary judgment, "[a] court may not . . . choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the nonmoving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).

<u>ANALYSIS</u>

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "It is well established that persons in criminal custody are entirely dependent on the state for their medical care." *Mitchell v. Kallas*, 895 F.3d 492, 496 (7th Cir. 2018) (citing *Estelle*, 429 U.S. at 103). The Supreme Court has thus recognized that the Eighth Amendment's proscription against cruel and unusual punishment creates an obligation for prison officials to provide inmates with adequate medical care. *Gabb v. Wexford Health Sources, Inc.*, No. 18-2351, 2019 WL 2498640, at *3 (7th Cir. June 17, 2019) (citing *Estelle*, 429 U.S. at 102–03); *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, (1994)).

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-92. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

I.      Serious Medical Need

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir.

2010). Importantly, "[a] medical condition need not be life-threatening to be serious." *Id.*
It can be a condition that "significantly affects an individual's daily activities" or a
condition that would result in further significant injury or chronic and substantial pain if
left untreated. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

Plaintiff complained of prolonged pain starting from his fall on June 26, 2016
through February 13, 2019, the date of his deposition (Doc. 187-1, pp. 136; 152-154). For
approximately three years (if not longer), Plaintiff experienced tingling, daily numbness
in his hands, and pain in his hands, as well as ear pain, dizziness, and lower back pain.
*Id.* He cannot write or brush his teeth for longer than 5 minutes without his hand locking
or cramping up with pain. *Id.*

Although the Wexford Defendants contest whether Plaintiff suffers from a serious
medical condition (Doc. 185, pp. 11-13), Plaintiff describes a constant series of ailments
that impede his daily life and have done so over the last three years. When the undisputed
facts are viewed in the light most favorable to Plaintiff, a reasonable jury could find that
this chronic series of ailments constitutes a serious medical need.

As for Plaintiff's arguments that his BUN/CREAT level was low and was,
therefore, a serious medical condition, there is not enough evidence in the record for a
reasonable juror to come to this conclusion. Plaintiff has not advanced any evidence,
besides his own opinions and the opinions of family members through his own
testimony, that a BUN/CREAT level of 8.1 when the normal range is 12 to 20 caused any
of his ailments above or is a serious medical need. Therefore, a reasonable jury could not
find that his BUN/CREAT level, alone, constitutes a serious medical need.

II.     Deliberate Indifference

In order to show that prison officials acted with deliberate indifference, a plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.").

In order for a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citation omitted).

**Count 1—**Deliberate Indifference Against Defendant Garcia

Plaintiff argues that Defendant Garcia was deliberately indifferent to his serious medical needs by doing nothing more than inspecting his hands during the examinations

and providing medications. Plaintiff argues Defendant Garcia should have made an effort to diagnose why Plaintiff's hands were still swollen a month after his injury and why he still experienced pain (Doc. 197, p. 13). Defendant Garcia argues he is entitled to summary judgment because he only saw Plaintiff for treatment a total of two times, on July 27, 2016 and October 26, 2016. During both examinations, Defendant Garcia examined Plaintiff and recorded his findings. Defendant Garcia diagnosed Plaintiff with arthralgia and stiffness, and prescribed him with medication for his symptoms. During the second examination, Defendant Garcia did not observe any swelling in Plaintiff's hands or wrist, but to provide Plaintiff with relief, he prescribed more medication for the pain. Lastly, Defendant Garcia argues he did not have any encounters with Plaintiff regarding the BUN/CREAT and, therefore, does not possess the necessary mindset to be held liable for alleged constitutional violations regarding Plaintiff's BUN/CREAT ratio (Doc. 185, pp. 14-16).

In considering the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact regarding whether Defendant Garcia was deliberately indifferent to his serious medical needs. There is no evidence that Defendant Garcia's recommended course of treatment was plainly inappropriate in light of Plaintiff's complaints, as Defendant Garcia examined Plaintiff's hands, addressed his concerns, and prescribed him medication to alleviate his symptoms. Similarly, there is no evidence that Plaintiff required an immediate referral for additional testing or treatment at this stage. In addition, Plaintiff testified that he has no proof that Defendant Garcia received information about his BUN/CREAT ratio and blood testing

(Doc. 1871-1, pp. 24-25). Accordingly, Defendant Garcia is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

**Count 2**—Deliberate Indifference Against Defendant Santos

Defendant Santos argues he is similarly entitled to summary judgment because he provided consistent, thorough care to Plaintiff over the course of approximately four months from November 2016 to February 2017. Plaintiff disagrees and argues Defendant Santos was, at times, rude and physically abusive to Plaintiff during the medical examinations. In addition, Plaintiff argues Defendant Santos withheld information about his blood tests, specifically that Plaintiff's BUN/CREAT ratio was abnormal, and did not provide access to a specialized diet in order to combat the effects of this blood disorder.

"There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway*, 700 F.3d at 1073 (citation omitted). For that reason, a medical professional is entitled to deference in treatment decisions so long as they are based on professional judgment. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citing *Roe*, 631 F.3d at 857 (7th Cir. 2011)). "By definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)). *See also Roe*, 631 F.3d 843 at 859 ("[I]t is implicit in the professional judgment standard itself . . . that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and

stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments.") "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." *Zaya*, 836 F.3d at 805. "[W]here evidence exists that the defendant knew better than to make the medical decision that he did, then summary judgment is improper." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)).

In determining whether medical care evidences deliberate indifference to serious medical needs, the court looks at the "totality of an inmate's medical care." *Petties,* 836 F.3d at 728. The "[f]irst, and most obvious" circumstance in which a medical professional's actions may constitute deliberate indifference "is a [doctor's] decision to ignore a request for medical assistance." *Id.* at 729. A jury can also infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious." *Id.* And in cases "where unnecessary risk may be imperceptible to a lay person," a jury can find deliberate indifference when there is proof that the medical professional's decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* In other words, "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 860 (citing *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 989 (7th Cir. 1998)).

Because the permissible bounds of competent medical judgment are not always clear, even among the medical community, "it can be challenging to draw a line between an acceptable difference of opinion . . .  and an action that reflects sub-minimal competence." *Petties*, 836 F.3d at 729. The Seventh Circuit has identified a number of circumstances that might suggest deliberate indifference, including when a doctor persists in a course of treatment known to be ineffective; when a doctor "chooses an easier and less efficacious treatment" based on cost or convenience rather than medical judgment; and an inexplicable delay in treatment which serves no penological interest. *Id.* at 730, 733.

Here, the evidence construed in the light most favorable to Plaintiff suggests that while Defendant Santos may have spoken to Plaintiff in an unprofessional manner during his examinations, he did not prevent him from receiving treatment. Defendant Santos continually assessed Plaintiff's complaints each time he sought help at Centralia's health center. When viewing Plaintiff's medical record as a whole, there is an *extensive record* of follow-up appointments with physical examinations and further testing to address Plaintiff's ailments. From the beginning of Plaintiff's medical issues until February 2017, when he stopped seeking treatment at Centralia, he received multiple prescriptions for pain medication, a urine test, a blood test, and an X-ray over the course of approximately thirty appointments.

Plaintiff argues that additional testing, such as an MRI and CAT scan, as well as a specialized diet for his low BUN/CREAT ratio were necessary to his treatment and not receiving this care, in particular, proves deliberate indifference (Doc. 197). Plaintiff based

these claims on the advice of family friends who are in the medical field and expressed these wishes to Defendant Santos (Doc. 187-1, pp. 80-82). There is nothing else, though, in the record to support that Defendant Santos's course of care diverged from appropriate medical standards or that these tests were necessary for Plaintiff to receive care. The Seventh Circuit has held that "evidence that another doctor would have followed a different course of treatment is insufficient to sustain a deliberate indifference claim." *Burton v. Downey*, 805 F.3d 776, 787 (7th Cir. 2015).[5] To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)).

Even so, Plaintiff still complained of pain and grew so frustrated with his care that he stopped seeking treatment. This alone, though, does not prove that his doctors were deliberately indifferent to his medical issues. The fact that the care he received did not entirely resolve his issues, or was not the type of care that he wanted, cannot support an Eighth Amendment claim.   *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) ("medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim"). Plaintiff was examined and prescribed various

---

[5] In *Burton*, the Seventh Circuit found that the medical staff treating a pretrial detainee was not deliberately indifferent when they ignored the detainee's preference for a narcotic pain medication, even when he displayed withdrawal symptoms and suffered extreme post-surgical pain. *Id.* Preference of one pain medication over another does not give rise to a deliberate indifference claim, as prisoners "are not entitled to receive 'unqualified access to healthcare.'" *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

and different medications in order to alleviate his symptoms. His doctors also prescribed him the same medications for different amounts of time to see if they relieved his pain. There is no showing that these medications would be inappropriate for Plaintiff's medical condition or that attempting to find the correct combination of medications to alleviate Plaintiff's symptoms was inappropriate.   There is also no evidence that Defendant Santos prevented Plaintiff from acquiring the medications prescribed or that he delayed treatment overall. In fact, the record shows that Defendant Santos saw Plaintiff within a few days of each nurses' referral. It is undisputed that Plaintiff had consistent access to care for his ailments, even if Plaintiff would have preferred different treatment and tests. Accordingly, Defendant Santos is also entitled to summary judgment.

**Count 3—Deliberate Indifference Against Defendants Krebs and Meeks**

Plaintiff argues that Defendants Krebs and Meeks knew about the serious nature of his ailments and did nothing to address his concerns about his care or provide him with necessary medical care for these ailments (Doc. 197). According to Plaintiff, Defendants Krebs and Meeks were made aware that Debrox continued to be prescribed despite Plaintiff's dizziness, but did nothing to intervene to assist Plaintiff with his health concerns, including that they failed to intervene to prescribe an MRI for Plaintiff's hand, a CAT scan for his issues related to his low BUN/Creatinine, and pain medication beyond the medications prescribed by Defendants Santos and Garcia (Doc. 187-1, pp. 67, 86-90, 96-97, 125). Defendants Meeks and Krebs argue they do not have the requisite knowledge to have been deliberately indifferent to Plaintiff's medical needs and that they are entitled

to qualified immunity (Doc. 187).

I.     Requisite Knowledge to be Deliberately Indifferent

The doctrine of respondeat superior does not apply in § 1983 actions. *See Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 692 (1978). A defendant's liability depends on his or her "knowledge or actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Only persons who cause or participate in an alleged constitutional deprivation are responsible under § 1983. *See Greeno v. Daley*, 414 F.3d 645, 656-657 (7th Cir. 2005).

In Eighth Amendment claims arising from a prisoner's medical care, a non-medical prison official is entitled to summary judgment when he reasonably responds to an inmate's complaint or grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition. *Johnson v. Doughty*. 433 F.3d 1001, 1010-12 (7th Cir. 2006).

Here, the Court has already determined that both Defendants Santos and Garcia are entitled to summary judgment on Plaintiff's deliberate indifference claims as the undisputed facts show that both Defendants provided medical care to Plaintiff that did not violate his constitutional rights. Similarly, Defendants Krebs and Meeks are also entitled to summary judgment, as they both investigated Plaintiff's grievances and provided responses to Plaintiff's grievances about his care, demonstrating they do not have the necessary state of mind for a deliberate indifference claim. In fact, as a result of Defendant Meeks's response to Plaintiff's grievance, he was recommended for additional treatment in the form of a mental health examination. *See Johnson*, 433 F.3d at 1010,

referencing *Greeno,* 414 F.3d at 656 ("Perhaps it would be a different matter if [the non-medical prison official] had ignored [the plaintiff's] complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address [the plaintiff's] concerns.").[6]

## II.   Qualified Immunity

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct.   *See Pearson*, 555 U.S. at 232. *See also*

---

[6] *See also Hernandez v. Keane,* 341 F.3d 137, 148 (2d Cir.2003); *Durmer v. O'Carroll,* 991 F.2d 64, 69 (3d Cir.1993)); *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir.2004); and *Bond v. Aguinaldo,* 228 F.Supp.2d 918, 920 (N.D.Ill.2002) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

*Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015)(citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S.Ct. 348, 350 (2014).

For the reasons stated above, the Court finds that Defendants Krebs and Meeks are entitled to qualified immunity because, even when the facts are taken in the light most favorable to Plaintiff, they engaged in no conduct that violated Plaintiff's constitutionally-protected rights.

**Count 4—Wexford Health Sources had seven unconstitutional policies, protocols, or customs that violated Plaintiff's constitutional rights**

Plaintiff argues that there are a series of unconstitutional policies and protocols implemented by Wexford at Centralia that violated Plaintiff's rights as he sought care for his ailments in 2016-2017. These seven policies are as follows: 1) prescribing OTC painkillers only; 2) requiring certain conditions to reach a "panic" level prior to providing preventative care; 3) refusing to see inmates if they don't pay a co-pay; 4) only providing

ear drops for dizziness and wax build up; 5) refusing to staff a 24-hour doctor or evening doctor; 6) refusing to refer patients to an outside specialist; and 7) refusing to provide special diets when blood results are out of range. (Doc. 8, p. 7)

Plaintiff asserts that there are material facts for the jury to consider regarding this argument, but fails to outline *what* those material facts are (Doc. 197, pp. 16-17). The Wexford Defendants argue that Plaintiff has failed to provide evidence that there are a series of policies and protocols that violated Plaintiff's rights and that Plaintiff has not properly alleged these claims under a *Monell* theory of liability (Doc. 199, p. 13).

Wexford is a private corporation that has contracted to provide essential government services, namely to provide medical care to prisoners in IDOC custody, and can thus be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014)). Under *Monell*, Wexford cannot be held vicariously liable for the actions of its agents or employees in violating an individual's constitutional right. *Id.* at 789 ("*Respondeat superior* liability does not apply to private corporations under § 1983."). Wexford can be held liable only for its own constitutional violations. *Id.* "The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*). An action is one of the "institution itself," when the constitutional injury was caused by (1) an official policy adopted and promulgated by its employees, (2) a practice or custom that, although not officially authorized, is widespread and well-settled; or (3) an official with final policy-

Page 26 of 28

making authority. *Glisson*, 849 F.3d at 381. *Accord Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

*Monell* claims based on a widespread practice require proof of "a series of violations." *J.K.J. v. Polk Cty.*, No. 18-1498, 2019 WL 2610999, at *9 (7th Cir. June 26, 2019) (quoting *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003)). "[P]roof of isolated acts of misconduct will not suffice." *J.K.J.*, 2019 WL 2610999, at *9 (quoting *Palmer*, 327 F.3d at 596). *See also Thomas*, 604 F.3d at 303 ("[T]he plaintiff must demonstrate that there is a policy at issue rather than a random event."). But beyond saying that "a series of violations" is necessary, there are no "bright-line rules" or "clear consensus as to how frequently such conduct must occur to impose *Monell* liability[.]" *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006) (quoting *Cosby v. Ward,* 843 F.2d 967, 983 (7th Cir. 1988)).

Defendants argue that Plaintiff has completely failed to provide evidence of liability to Wexford in the form of a *Monell* claim and the Court agrees. Plaintiff has not offered any evidence in the record about Wexford's policies beyond his own experience. In addition, Plaintiff himself testified that he has not seen any Wexford policies regarding inmate medical care to support his theory that his experiences are indicative of widespread Wexford policies at Centralia (Doc. 187-1, pp. 94-98). Accordingly, Wexford is entitled to summary judgment.

## CONCLUSION

For the above-stated reasons, Defendants' motions for summary judgment (Docs. 184, 185, and 187) are **GRANTED** and this action is **DISMISSED with prejudice**. The

Clerk of Court is **DIRECTED** to enter judgment in favor of all Defendants and against

Plaintiff and close this case on the Court's docket.


**IT IS SO ORDERED.**

**DATED:   May 29, 2020**

s/   Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**